[Sac. No. 607. In Bank.—October 29, 1900.]

In the Matter of the Estate of ELVINEIGH M. KENDRICK, Deceased. ELIZA MASTERSON et al., Contestants of Will, Appellants, v. JAMES SHELTON, Executor, Proponent, and JENNIE T. SHELTON, Devisee, Respondents.

WILL—CONTEST OF PROBATE — UNSOUND MIND OF TESTATOR — INSANE DELUSIONS—SHOWING REQUIRED.—In order to sustain a contest of the probate of a will for the unsoundness of the mind of the testator, by reason of insane delusions, it must be shown that the delusions were not merely temporary hallucinations, or unfounded dislikes or antipathies, or false opinions and beliefs, but were spontaneous and firmly fixed beliefs of a diseased mind, which no argument or evidence could convince to the contrary, and which a rational mind would not entertain, and also that the insane delusions operated to cause the production of the will under attack.

ID.—VERDICT AGAINST EVIDENCE.—The evidence reviewed, and held to be insufficient to sustain the verdict of the jury that at the time of the making of the will the testator lacked testamentary capacity by reason of unsoundness of mind. [McFarland, J., dissenting.]

ID.—UNDUE INFLUENCE—CHANGE OF WILL—SUPPORT OF VERDICT.—A verdict that the will was obtained by undue influence is supported by evidence showing that it was changed in favor of a niece who was well to do, from a previous will in favor of a sister who was poor and had a large family, and that the testatrix, after having suffered a paralytic stroke, sent for the niece to induce her to support the previous will, and to make her a present in that view, and that the niece, after learning of the will, spoke against the sister to the testatrix, and had repeated and long conversations with her just before the will was changed, after which conversations the testatrix, while in an enfeebled condition, put herself in the hands of the niece to be controlled by her in the change of the will.

ID.—ISSUE OF FRAUD NOT SUBMITTED—MISLEADING INSTRUCTION.—Where the only issues submitted to the jury were insanity and undue influence, an instruction upon the question of fraud, which the court had refused to submit to the jury, was confusing and misleading.

ID.—ERRONEOUS INSTRUCTIONS — INSANE DELUSIONS — DEFINITION—CONSEQUENCES.—Instructions on the subject of insane delusions, which omit from the definition thereof the element that it must be ad-

hered to against reason and evidence, and which omit from the declared consequences thereof in vitiating the will the important qualification that the jury must find that the particular will in question was caused by, or was the product of, one or more insane delusions, are erroneous.

ID.—"INSANE PREJUDICE"—MISLEADING INSTRUCTION.—An instruction which predicates unsoundness of mind of the testatrix upon the possession of an "insane prejudice" which influenced her will in the disposition of her property, is confusing and misleading in not using the recognized term "insane delusion," which has a well-defined and exact meaning.

ID.—UNDUE INFLUENCE—PROOF—DEFINITION—IMPROPER INSTRUCTION.— An instruction upon the subject of undue influence, which is argumentative and which purports to enumerate circumstances proving undue influence, which may merely tend to show undue influence, but which are in nowise conclusive thereof, and which declares it not possible with exactness to define or describe undue influence except in general and approximate terms, and seems to leave to the jury the determination as to what may constitute undue influence, is erroneous.

APPEAL from an order of the Superior Court of Glenn County denying a new trial.   Frank Moody, Judge.

The facts are stated in the opinion of the court.

F. C. Lusk, and Seth Millington, for Appellants.

Cannon & Freeman, Charles L. Donohoe, and B. F. Geis, for Respondents.

HENSHAW, J.—There was offered for probate before the superior court of Glenn county an instrument asserted to be the last will and testament of Elvineigh M. Kendrick, deceased, executed upon April 16, 1894.   Certain brothers, sisters, nephews, and nieces of the deceased contested the probate upon various grounds, and a trial was had before a jury, to which the court submitted two special issues: 1. Was the decedent, at the time she executed the will, of sound mind?   2. Was the decedent, at the time she executed the will, acting under undue influence exercised over her by James Shelton, Jennie T. Shelton, Zellor Shelton, and Dr. Cameron, or either of them?   The jury returned verdicts in favor of the contestants upon both of these issues, and a judgment refusing probate to the will followed.   The proponents of the will moved for a

new trial, and upon denial of their motion have appealed from the order.

Mrs. Kendrick was of French parentage, and one of a family of nine children, born in Missouri. She was a widow in 1853, in which year she came to California. In the following year she married James Kendrick, and with him lived in the northwestern part of Colusa county, now Glenn county, until he died in 1887. Some of her relatives, brothers and sisters, accompanied or followed her to California, and in particular a sister, Mrs. Masterson, who is prominent in this contest. Upon the death of her husband Mrs. Kendrick was left a childless widow, with a fortune in value from seventy-five thousand to one hundred thousand dollars. She was a woman of masculine temperament, and did a man's work upon the farm, drove teams, broke colts, and the like. She possessed other characteristics commonly recognized as masculine. In speech, when angry, she was violent, extravagant, and exceedingly profane. Yet, withal, she was a kindly woman of generous impulses, and bestowed her money freely upon her relatives. So liberal had she been with her gratuities and donations that at the time of her death, of the considerable fortune left her by her husband, with its increase, she had disposed of all but about fifteen thousand dollars. Only this amount is affected by the will. The sister, Mrs. Masterson, came to Colusa county in 1858, and has lived there near to Mrs. Kendrick ever since. Mrs. Masterson was poor, and had a large family. Both before and after Kendrick's death Mrs. Kendrick contributed largely to the support of Mrs. Masterson and her family, and aided her in rearing her children. The sisters were on terms of intimate friendship, but their intimacy was frequently interrupted by violent quarrels, lasting sometimes for months, during which they saw nothing of each other. Overtures to a reconciliation would then follow, their differences would be healed and their friendship resumed. By the terms of the offered will the property of Mrs. Kendrick was devised and bequeathed to Mrs. Shelton. Mrs. Shelton was the daughter of a living brother of Mrs. Kendrick, and, therefore, not an heir at law. Mrs. Shelton, it is said, was by temperament and disposition very like her aunt, and was a favorite with her. Mr. Shelton was Mrs. Kendrick's business agent and trusted man-

ager of her affairs. Before her death Mrs. Kendrick had given to the Mastersons money and property to the amount of twenty-eight thousand dollars, and to the Sheltons as much or more. About the year 1890 Mrs. Kendrick was informed that she had Bright's disease, and that it was progressive and incurable.

In July, 1893, she made her will, leaving all of her property to her sister, Mrs. Masterson, the gift, however, being coupled with a request that out of the property she pay certain specified sums to named relatives and friends. On February 10, 1894, at her home in Orland, she was stricken with paralysis, which resulted in hemiplegia. Mrs. Masterson was with her and attendant upon her at the time of this attack. The Sheltons arrived soon after, and became aware for the first time of the existence of the will in Mrs. Masterson's favor. Differences arose between the two sisters, the nature of which will become a matter of future consideration. Mrs. Masterson left the house, and thereafter during Mrs. Kendrick's life had no further intercourse with her. Upon February 22, 1894, Mrs. Kendrick destroyed the will in Mrs. Masterson's favor, and made a new one giving all of her property to James Shelton, the husband of her niece. Afterward she was taken by the Sheltons to their home, where on the sixteenth day of April, 1894, she made a later will, the one here offered for probate, in which all of the property was left to Mrs. Shelton, whose husband was named as executor. She remained at the home of the Sheltons until her death in August, 1895.

1. The jury found that the deceased was incapable of making testamentary disposition of her property by reason of her unsoundness of mind. Mrs. Kendrick had suffered a stroke of paralysis affecting one-half of her body. There was a blood clot upon her brain. She was thus unquestionably enfeebled both mentally and physically. But the contention that her condition was one of dementia or insanity cannot for a moment be entertained. It appears almost without question that she conversed intelligently and well, and that she had an excellent knowledge of every-day affairs, of her property and interests. She certainly had a mind and memory competent to deal with and intelligently to dispose of her property among

the selected beneficiaries of her bounty.  (*Greenwood v. Greenwood*, 3 Curt. 2.)

The stress of the argument upon this point is, however, devoted to the proposition that Mrs. Kendrick was a monomaniac, and the victim of insane delusions influencing the making of this will in favor of Mrs. Shelton and to the exclusion of the other relatives.  So far as the relatives other than Mrs. Masterson are concerned, the consideration may be brief.  She is not shown to have harbored any particular animosity against nor to have displayed any particular affection for them.  No evidence is offered of any insane delusion touching them, or any of them, save Mrs. Masterson alone.  As to her, the case presented by respondents is the following: After her stroke of paralysis the deceased gave evidence of a hostility against Mrs. Masterson as violent as it was groundless.  She hoped Mrs. Masterson would rot off the face of the earth with her cancer.  She would like to see her burning to death on a brush pile, and would never give her a drop of water to drink.  The following is an enumeration of the insane delusions under which it is said Mrs. Kendrick was laboring from and after the time of her paralysis: 1. That there were lice upon her bedclothes and person, and that there was tallow in all of her food; 2. That Mrs. Masterson had stolen all her wearing apparel; 3. That Mrs. Masterson was or had been trying to put her out of the house that she occupied; and 4. That Mrs. Masterson had tried to kill her.

In considering these specifications it is important to bear in mind exactly what an insane delusion is, and what kind of an insane delusion will justify the refusal of probate to so solemn and important an instrument as a will.  Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion.  Whenever one's mind is tricked or deceived into a false opinion or belief, it has been played upon; it is deluded.  But an insane delusion is the spontaneous production of a diseased mind leading to the belief in the existence of something which either does not exist or does not exist in the manner believed—a belief which a rational mind would not entertain, yet which is so firmly fixed

that neither argument nor evidence can convince to the con-
trary. Moreover such an insane delusion must have operated
to cause the production of the will which is under attack. (*Es-
tate of Carpenter*, 94 Cal. 406; *In re McDevitt*, 95 Cal. 33; *Cole's
Will*, 49 Wis. 181; *Middleditch v. Williams*, 45 N. J. Eq. 734;
*Stackhouse v. Horton*, 15 N. J. Eq. 228; 1 Redfield on Wills,
89; *Estate of Scott*, 128 Cal. 57.)

Considering the evidence in support of these alleged insane
delusions in the light of the well-settled principles just enun-
ciated, it appears that after her stroke of paralysis Mrs. Ken-
drick believed that she was infested with lice, and that tallow
was placed in her food. These beliefs were unquestionably un-
founded. They were held with a tenacity characteristic of an
insane delusion. Neither argument nor evidence could con-
vince her to the contrary. But at the same time they were
not permanent, and passed away as the patient recovered from
the shock of her attack. They seem rather to have been in
the nature of the hallucinations which accompany the delirium
of a fever patient. But, considering them as insane delusions,
they were not insane delusions operating to produce the will
in question. It does not appear that Mrs. Kendrick attributed
the pest of the lice or the presence of the tallow to the machi-
nations of Mrs. Masterson, or any other of the contestants.
As to the second, by the testimony of two witnesses it is in
evidence that Mrs. Kendrick lay naked in bed, and accounted
for her lack of wearing apparel by the charge that Mrs. Mas-
terson had stolen her clothing. As against this there is the
testimony of many people who came in contact with her, and
by whom she was surrounded, to the effect that they never
heard Mrs. Kendrick utter such a charge. Moreover, it does
not appear that the sick woman was ever reasoned with upon
the matter, or that any effort was made to convince her of
the falsity of her belief. It does not appear how she acquired
the belief. If she believed it upon the evidence of her senses,
or upon the statements of some one in whom she had confidence,
no matter how ill-founded her conviction might have been, it
could not be placed in the category of insane delusions. The
third alleged insane delusion is thus fairly explained by the
evidence: Mrs. Kendrick had given to Mrs. Masterson a deed

to the house which the former was occupying, with the express understanding that it was not to be placed on record until after Mrs. Kendrick's death. Very soon after Mrs. Kendrick suffered the paralytic shock Mrs. Masterson caused the deed to be recorded. Mrs. Kendrick sent for the keys of the house; Mrs. Masterson had taken them. This seems to have been the source and origin of the final quarrel between the sisters. Mrs. Masterson explained to Mrs. Kendrick that she had no thought of ejecting her, and offered to return to her the recorded deed, but the passionate sick woman refused to, accept the explanation and grew angry over Mrs. Masterson's violation of their understanding. The violated agreement, the recording of the deed, the detention of the keys, the locking of the chicken-house, the sale and removal of Mrs. Kendrick's lard, while not sufficient to justify the conclusion that Mrs. Masterson did intend to eject her invalid sister from the house, afforded some ground of belief to the sick and irascible woman that her sister designed to take advantage of her helplessness. And it being further considered that Mrs. Kendrick, when aroused, seems to have been both violent and extravagant of speech, the matter of the accusation does not appear extraordinary. At least the belief did not originate in a diseased mind, but found color for its support in the matters that have been recited. It cannot, then, be considered an insane delusion. The facts concerning the accusation that Mrs. Masterson had tried to kill her are these: Mrs. Kendrick had been taking morphine to relieve her pain. The doses and the times of their administration had been prescribed. Upon an occasion shortly after the paralysis Mrs. Masterson administered one dose, which, failing to relieve the patient, was followed by a second. When this was known Mrs. Masterson was expostulated with. It was told her that she might injure or kill the patient, to which she replied that it did her no harm. This event, like others in the case, is in dispute, but it does affirmatively appear that Mrs. Shelton related the matter to Mrs. Kendrick. When the testimony which bears upon this accusation by Mrs. Kendrick against Mrs. Masterson is analyzed, it will be found that it has reference to this occurrence, Mrs. Kendrick saying that Mrs. Masterson had tried to

kill her by poison, or had given her an overdose of morphine, and similar expressions. There was for this accusation the foundation which has been related. It was not the groundless and self-originating belief of a diseased mind. As to the extravagant form of the charge, allowance must be made for the temper and violence of the accuser. Finally, as to each and all of these alleged delusions, it does not appear that any of them were dominant ideas in the mind of Mrs. Kendrick. They were not always nor constantly referred to when Mrs. Masterson was under consideration, and very many witnesses never heard any such expressions from her. It is a characteristic of monomania and insane delusion that when the conversation turns upon the subject, the patient is dominated by it and cannot conceal his conviction. We conclude, therefore, that the finding of the jury that at the time of the making of the will Mrs. Kendrick lacked testamentary capacity by reason of unsoundness of mind is not supported by the evidence.

2. Upon the question of undue influence the following was made to appear: Some years before the date of these occurrences Mrs. Shelton had expressed her desire and intention of separating the two sisters and breaking up their intimacy. More than a year before Mrs. Kendrick suffered the paralytic shock her will had been executed in favor of Mrs. Masterson. Of this the Sheltons were in ignorance. They were informed of the fact shortly after Mrs. Kendrick was stricken. Mrs. Kendrick stated that she sent for the Sheltons after she was paralyzed to inform them of the will in Mrs. Masterson's favor, and to give them a three thousand dollar note so that they would not make Mrs. Masterson any trouble about the will. About ten days thereafter a new will was prepared leaving all of the property to Mr. Shelton. The Sheltons were well to do. Mrs. Masterson was poor. The will by which Mrs. Shelton took cannot be said to be an unnatural will in the legal sense, since if Mrs. Masterson was a favorite sister, Mrs. Shelton was a favorite niece, and no lineal descendants of Mrs. Kendrick were excluded; but, at the same time, the fact of the changed disposition of the property and the circumstances surrounding and attending the change are proper for consideration. Upon the night of February 22d Mrs. Shelton, watching by

the bedside of her aunt, held a long, earnest, whispered conversation with her. It lasted for hours. At the conclusion of this conversation Mrs. Shelton said: " 'Aunt Elvineigh, I will send for Mr. Shelton.' My aunt replied: 'Do as you like, child.' " Mrs. Shelton then said: "Will I send now, or wait until morning?" Mrs. Kendrick said: "I don't care which." Mrs. Shelton said: "I will go call Mr. Prentiss now," and aunt said: "Do as you like, child." Thereupon Mrs. Shelton left the house, aroused Mr. Prentiss, and told him to go for her husband, that Mrs. Kendrick wanted to change her will. Later in the day the will in Mrs. Masterson's favor was burned, Mrs. Shelton placing it in the fire at her aunt's direction. Upon the same day Mr. Shelton arrived at the house with a lawyer, and the will was drawn in his favor. To a Mrs. Flood, and in the presence of Mrs. Shelton, Mrs. Kendrick stated, and of this Mrs. Shelton makes no denial, that "Mrs. Shelton told her Mrs. Masterson was trying to poison her, and that she didn't know it before that. . . . . She said she had changed her mind about giving the property to the Mastersons after she heard that they had tried to poison her, and that was the reason she had changed her mind." It is conceded that the will offered in probate by which the property is left to Mrs. Shelton was made in effectuation of the same idea that existed when the will in favor of Mr. Shelton was prepared. If the one was the product of undue influence, so was the other. The presumption in favor of fair dealing always prevails, saving in those cases where the parties stand in the relation of legal confidence the one to the other. It is well settled that the naked facts that a will is in favor of one person, that that person had opportunity to coerce the mind of the testator, and that the evidence raises a suspicion that he did so, are not sufficient to justify the conclusion that undue influence was exercised. The evidence must amount to proof, and, as is said in *In re Langford,* 108 Cal. 608: "It has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator."

Upon the question of the sufficiency of this evidence to support the verdict that the will was procured by undue influence,

we confess a feeling of some doubt. The question is a close one. But considering that there is in evidence the expressed intent of Mrs. Shelton to separate and break up the intimacy between the two sisters, that the Sheltons knew nothing of the will in Mrs. Masterson's favor until Mrs. Kendrick had suffered her paralytic stroke, that Mrs. Kendrick declared that she had sent for them to urge them to uphold the will, that during the ten days that elapsed from the time of the shock to the making of the will in Shelton's favor differences had sprung up between the sisters, that Mrs. Shelton was in repeated whispered conversations with her sick aunt, that the long whispered conversation upon the night preceding the making of the new will manifestly bore upon the subject, that Mrs. Kendrick at the conclusion of that conversation seems to have put herself unreservedly in the hands of her niece and to have been dominated by her—these facts and circumstances, taken with the admittedly enfeebled mental and physical condition of the testatrix, we think must be held sufficient to justify the verdict of the jury.

Many of the instructions given by the court are criticised by appellant. Some of these demand consideration. Besides undue influence and mental incompetency the contestants charged fraud in the procurement of the will. The court refused to submit to the jury the issue of fraud, and must have done so under the conviction that the evidence was insufficient to warrant the submission of that ground of contest to the decision of the jury. The jury was asked to pass upon but two issues, mental incompetency and undue influence; yet, at the same time, when the court came to deliver its instructions it charged fully upon this question. If the charge of fraud was not sufficiently supported by the evidence to have warranted its submission to the jury, it was confusing and misleading for the court to instruct upon that question.

By instruction 14 the court charged as follows: "An insane delusion is the pertinacious belief of the existence of something which does not exist, and the acting upon that belief. Belief of things which are entirely without foundation in fact, and which no sane person would believe, is insane delusion. If a person be under a delusion, though there be but partial in-

sanity, yet if it be in relation to the act in question, it will defeat a will which is the direct offspring of that partial insanity."

This instruction is erroneous, and, as it was the only instruction in which the court attempted to define an insane delusion to the jury, it was clearly prejudicial to the appellant. It omits the essential element of an insane delusion—that it is created without reason or evidence and is adhered to against reason and evidence. It permits the confusion of a mistaken belief with an insane delusion. Support for this instruction is sought to be drawn by the respondents from the unreported case of *Clements v. McGinn* (Cal., Aug. 30, 1893), 33 Pac. Rep. 920; but an inspection of the record in the McGinn case discloses that the instruction here given is but a garbled extract from that delivered in the former case. The instruction in the McGinn case was as follows:

"Delusion of mind is to an extent insanity. The main character of insanity in a legal view is said to be the existence of a delusion—that is, that a person should pertinaciously believe something to exist which does not exist, and that he should act upon that belief. Belief of things which are entirely without foundation in fact, and of the existence of which the testator had no evidence and which no sane person would believe, is insane delusion; that is, when a person believes things to exist which exist only, or at the least in that degree only, in his own imagination, and of the nonexistence of which neither argument nor proof can convince him, that person is of unsound mind." It is readily seen that the definition thus given differs essentially from that which was given to the jury in the case at bar.

Instruction 26 is also faulty. In this the jury was told that if they believed that the deceased "was at the time when said instrument was signed and attested laboring under any delusion regarding the contestants, or any of them, that she cannot be regarded as or accounted as mentally sane in making said alleged will so far as the contestants or any of them are concerned, though she might be mentally sane as to the rest of the world." In this the jury was instructed that if the deceased entertained any delusion regarding any of the contest-

ants that she could not be regarded as mentally sane in mak-· ing the will. If by delusion is here meant an insane delusion, still the instruction is a faulty presentation of the law. It is not any insane delusion regarding the contestants or any of them; it is only an insane delusion which operated to the injury of the contestants to produce the will in question, which would justify the jury in declaring that the will was the product of an unsound mind.

By instruction 27 the jury was told that if they were satisfied that the deceased, at the time of signing and attesting the will, conceived or believed that her sister, Eliza Masterson, had tried to kill her, etc., and that there was no foundation for any such belief, and that she was incapable of being permanently reasoned out of that belief, "then you will be warranted in concluding that said deceased was laboring under an insane delusion, and it will be your duty to find as your answer and verdict that at the time of the making of said will she was of unsound mind."

The vice of this instruction is apparent. It omits the important qualification that the jury must also find that the particular will in question was caused by or was the product of some one of these insane delusions; for, if the insane delusion did not influence the making of the will in question, it would matter not how many such the deceased might have entertained.

By instruction 35 the jury was told that if Mrs. Kendrick had "an insane prejudice respecting her sister, Eliza Masterson, or any other of the contestants, or either of them, which influenced her will in disposing of her property thereby, and brought about the disposal of her property, which, if her mind had been entirely free from said insane prejudices, would not have been made, then your answer to issue one as to whether she was of sound mind at the time of making said will must be no." This sentence is a little confusing. It is not easy to pick out the antecedent nouns to the relative pronouns. But aside from this, it is unfortunate in importing into the law the novel phrase of "insane prejudice," to the end certainly of confusing if not of misleading the jury. Insane delusion is a recognized term of well-defined and exact meaning. What insane prejudice may be, we confess our inability to understand. If it means the

same as insane delusion, no advantage can be discerned in displacing the older and approved phrase for this new and untried one. If it means something different from insane delusion, then the proposition which is declared is without legal approval or sanction.

Instruction 11 is objectionable for several reasons: 1. It is argumentative; 2. It pretends to define the circumstances which will prove the existence of undue influence, whereas the circumstances enumerated, though they might have a tendency to show undue influence, are in nowise conclusive upon the question. The language of the instruction in this regard is the following: "Very seldom does it occur that a direct act of influence is apparent. The existence of influence must generally be gathered from circumstances, such as whether she had formerly intended a different disposition of her property; whether she was surrounded by those who had an object to accomplish to the exclusion of others; whether she was of such weak mind as to be subject to influence; whether the paper offered was such a paper as would probably be urged upon her by the persons surrounding her; whether they were benefited thereby to the exclusion of formerly intended beneficiaries." Each and all of these circumstances might be proved to exist, and yet neither singly nor altogether would they be sufficient to establish that the will was the product of undue influence. They are but circumstances attendant upon and surrounding the matter proper for the consideration of the jury, and with all other circumstances in the case to be given such weight as the jury may deem them entitled to. They would not, as the court instructs the jury, establish the existence of undue influence. In concluding this same instruction the court said: "It is not possible to define or describe with exactness what influence amounts to undue influence in the sense of the law. This can only be done in general and approximate terms. In each case the decision must be arrived at by application of the general principles to the special facts and surroundings of the case." To the contrary, what constitutes undue influence is well understood, and upon the question the courts are all in accord. (*In re McDevitt, supra; Estate of Calkins,* 112 Cal. 296; *Chandler v. Jost,* 96 Ala. 596.) The danger which lurks

in the paragraph from the instruction last above quoted is that it seems to leave to the jury the determination, not alone as to whether undue influence has been shown, but as to what may constitute such influence.

For the foregoing reasons the order appealed from is reversed.

Harrison, J., Temple, J., Van Dyke, J., and Garoutte, J., concurred.

McFARLAND, J., dissenting.—I am unable to concur in the judgment. I am aware that verdicts upsetting wills have frequently no substantial foundation in the evidence, and result from notions which jurors have as to how the will before them ought to have been; and I have frequently concurred in judgments here setting aside such verdicts, and have, in my own opinions, often expressed my views on the subject to the point that verdicts and judgments against the validity of wills should not be upheld here unless based on substantial evidence establishing the very matters which, in law, make an asserted will invalid. But in the case at bar I am not prepared to say that the evidence did not warrant the jury in finding either that the testatrix was laboring under insane delusions which directly operated to cause the production of the will in question, or that she at the time of the execution of the will was acting under undue influence as alleged by the contestants. And while some of the instructions to the jury, considered separately, are subject to hostile criticism, still I think that all the instructions, considered as a whole, gave the jury reasonably correct information on the difficult subjects of "insane delusions" and "undue influence," which have been greatly obscured by the vast amount of writing about them to be found in the law books; and I do not think that appellants were prejudiced by any part of the instructions which, considered independently of the others, might be held as not quite fully giving a legal definition. I think that the order appealed from should be affirmed.

Rehearing denied.

Beatty, C. J., dissented from the order denying a rehearing.