# RIDDLE *v.* GIBSON.*

TRIAL, POSTPONEMENT OF; CROSS-EXAMINATION; EVIDENCE; WILLS; IDENTIFY; REBUTTAL TESTIMONY; EXCEPTIONS; DIRECTION OF VERDICT; INSANE DELUSIONS.

1. The discretion of the trial court in overruling a motion for a postponement of the trial on the ground of want of opportunity to confer with a material witness was rightly exercised, and will not be disturbed on appeal, where it appears that diligent effort was not made to consult the witness at a reasonable period before the trial, and it was not shown that his testimony was material.

2. Where the witness of a will—a clerk in a bank of which the testatrix was a depositor—on cross-examination, in answer to the question whether he has any way of knowing that the woman who signed the paper was the testatrix except from the name that she signed, answers, "By comparison of the signatures," the answer is responsive to the question, and cannot properly be stricken out by the trial court.

3. Whether in a will contest, at the time of the admission of the will in evidence, there was sufficient evidence to establish the identity of the testatrix, is on appeal immaterial, where at a later stage ample evidence was introduced to fully establish her identity.

4. Where in a will contest question is made as to the identity of the testatrix, testimony showing that, before and after its execution, the

---

*Testamentary Capacity—Unnatural Disposition of Property.*—The effect, upon the validity of a will, of an unnatural testamentary disposition made therein, is discussed and the authorities presented in a note to *Meier* v. *Buchter,* 6 L.R.A.(N.S.) 202.

woman whose will it is claimed to be stated what she intended to do. with her property and what she had done with it, which disclosures exactly coincided with the provisions of the will, and that the will was drawn at the office of a trust company to which she had been sent for the purpose, coupled with the testimony of the subscribing witness, officers of the trust company, that the will was signed by a woman introducing herself by the name signed to the will,—is sufficient to fully establish the identity of the testatrix.

5. Where in a contest over the validity of a will by the terms of which the estate of the testatrix is left to her physician, to the exclusion of her heirs at law, the caveatee has introduced testimony in chief of declarations by the testatrix showing neglect by her relatives, and that on one occasion she was, because of her destination, obliged to carry her baby in her arms for a long distance, testimony offered in rebuttal by the caveator to show that the testatrix was not in such a condition of destitution is inadmissible.

6. An offer to prove by a witness that he was in a position to know whether a declaration by a decedent was true, but leaving to surmise what the answer of the witness would have been, is too vague and indefinite.

7. The trial court properly directs a verdict when the evidence introduced, with all the inferences that the jury may justifiably draw from it, is insufficient to support a contrary verdict. (Following *Ford* v. *Ford*, 27 App. D. C. 401, 6 L.R.A.(N.S.) 442, and *Scott* v. *District of Columbia*, 27 App. D. C. 413.)

8. Mere eccentricities, prejudices, or resentment against one or more relatives, without more, will not invalidate a will. (Following *Robinson* v. *Duvall*, 27 App. D. C. 546.)

9. An insane delusion exists when a person conceives the existence of something fanciful and extravagant, something having no foundation in reason or fact, and is dominated and controlled by such imagination, and therefore acts as he would not otherwise have acted.

10. Where a woman without children bequeaths the small estate she has been able to accumulate by her labor to her physician, who has been kind to her, to the exclusion of her brothers and sisters and other relatives who had been indifferent to her, she cannot be said to have been suffering from an insane delusion.

No. 1741.   Submitted February 7, 1907.   Decided March 5, 1907.

HEARING on an appeal from a judgment of the Supreme Court of the District of Columbia holding a probate court, admitting a will to probate after the trial by jury of issues framed to test its validity.                                   *Affirmed.*

The COURT in the opinion stated the facts as follows:

This is an appeal by John Riddle, Sr., and Alpheus E. Riddle, caveators, from an order admitting to probate and record a paper writing dated September 12, 1905, as the last will and testament of Kate Ross, deceased. Under the terms of this will Mrs. Ross left all her property, consisting of personalty valued at $2,768.20, to Dr. Frank E. Gibson, her physician.

The following issues were framed for submission to a jury:

"1. Was the said paper writing duly executed in due form of law as and for the last will and testament of the said Kate Ross?

"2. Was the said paper writing procured from the said Kate Ross by undue influence?

"3. Was the said paper writing procured from the said Kate Ross by fraud?

"4. Was the said Kate Ross, at the time of the execution of the said paper writing, of sound and disposing mind and capable of executing a valid deed or contract?"

Mrs. Ross was about sixty-three years old at the time of her death, and had lived in Washington about fifty years. She married about 1864, and had one child, a girl, who died about twenty years ago. Her husband deserted her in 1868 or 1869, when her child was only two years old. There was some evidence that Mrs. Ross was then in very straightened circumstances. Later she secured employment at the Bureau of Engraving & Printing, where she labored for more than thirty years, her work consisting of counting and assorting, and required both physical and mental activity. She did not give up her work until four or five days before her death, which occurred October 17, 1905, the cause being pneumonia. About a year before her death she met Dr. Gibson at the home of his mother, with whom she was on intimate terms. The doctor began treating her for rheumatism about December 1, 1904, and this treatment continued until the time of her death.

The caveatee introduced two witnesses to prove the formal execution of the will. F. B. Eichelberger, who was connected

with the Washington Loan & Trust Company, testified that a woman who introduced herself as Mrs. Kate Ross, and whom he had never before seen, came to the office of the trust company on the afternoon of September 12, 1905, and informed him that she wanted to have her will made; that he thereupon draughted it and gave it to a typewriter, and that later in the day Mrs. Ross returned and executed the will in his presence and in the presence of Elliot H. Thompson, a bookkeeper connected with the same company. No one was with Mrs. Ross on either occasion. Mr. Thompson testified that he saw Mrs. Ross execute the will, and on cross-examination stated that he was not personally acquainted with her, although she was a depositor and customer of his company. Thereupon the attorney for the caveators asked the witness, "Have you any way of knowing that that was Kate Ross except that she signed her name as Kate Ross?" To this the witness answered: "By comparison of signatures." To this answer caveators' counsel objected, and moved that the same be stricken out on the ground that the answer was not responsive, and was incompetent and inadmissible as evidence. The court overruled the motion, and exception was noted.

The caveators thereupon introduced thirteen witnesses, two brothers, three nephews, a niece, and a cousin of the testatrix being among these witnesses. John Riddle, Sr., a brother and one of the caveators, testified that he had not seen his sister for three years or more before her death, although he might have seen her any Sunday had he wanted to do so; that he never knew her husband; did not know when she was married; did not know anything about her husband's death, or how he disappeared, or whether or not efforts were made to locate him, although the witness was in Washington and Mrs. Ross was living in Washington at the time; did not know the number of the street where his sister lived at the time of her death; neither did he know how long she had lived there. Witness related a conversation with Dr. Gibson subsequent to the death of Mrs. Ross, which, however, contained nothing material to the issues.

The other brother, Charles Riddle, testified that he formerly

lived in Washington, but that he lived at La Plata, Maryland, at the time of his sister's death, and that he last saw his sister about two years before her death. He admitted that she had never been in his home in her life. The testimony of the other relatives failed to disclose the existence of intimate relations with Mrs. Ross. Not one of these thirteen witnesses was even asked on direct examination concerning the mental condition of the testatrix, and not one gave any evidence even remotely reflecting on her mental condition. One witness testified that Mrs. Ross on one occasion had said that her relatives "had not treated her kindly, and had not helped her when they could have done so." Another witness testified that she had known Mrs. Ross for about thirty years, and had worked with her all that time at the Bureau, and that she had never mentioned her relatives, but had spoken kindly of Dr. Gibson and his mother. This witness testified that the testatrix "had a strong will and a good mind." Another witness, who had known Mrs. Ross for about five years, testified that she had spoken of her relatives quite frequently, and had said that "they had never done anything for her and had treated her rather mean in the years gone by. * * * She said in time of need they did not come forward. * * * She was a woman of very strong will power. She worked and did her work thoroughly and properly to the last day she worked. * * * I would say she was of sound mind." A Mrs. Smith, a cousin of the testatrix, testified that she had known her all her life, and had lived in Washington since 1854. She said the testatrix "and the members of her family never had any fusses, never quarreled, but that she was somewhat prejudiced; said they were unkind to her. * * * She thought her relatives ought to have helped her. She was a woman of very strong mind and very strong will; not easily persuaded, because I have tried to persuade her. I never saw her when I thought she was of unsound mind. She always spoke of Dr. Gibson and his mother being kind to her."

The testimony of the other witnesses for the caveators was to the same effect, and need not be repeated here.

After the introduction of evidence by the caveators, caveatee

produced fifteen witnesses, nearly all of whom testified as to the mental capacity of Mrs. Ross.

Frank E. Speare said he had known Mrs. Ross for about thirty years, and that she came to his office, 940 F street, a month or six weeks before her death, and said she had come to consult him about making her will. She then asked him to whom to go. Upon learning that her funds were in the Washington Loan & Trust Company, he advised her to go there to have her will drawn. He further testified that "she said she wanted to leave her property so that her relatives would not get it; that not one of them during her sickness had been even to inquire for her; that her relatives had never done anything for her. She wanted her money placed so that the ones who had looked after and cared for her would get the benefit of it. She came there alone, and went away alone, toward the corner of 9th and F streets," the location of the Washington Loan & Trust Company.

Mrs. Laura Lochte testified that she had known Mrs. Ross for about four years before her death, and lived about a square from her, and saw her frequently; that the September before her death she came to the house of witness and informed her that she had just come from the Loan & Trust Company; that she had just been "to see Mr. Speare to direct her to an attorney to make her will. That she had made her will and left everything to Dr. Gibson. That she did not want her people to have one penny. That they never did anything for her, or come to see her in her sickness and affliction and her daughter's sickness and death. She said Dr. Gibson was very kind to her, more like a son. She was of sound mind, and a very bright woman, and had a very strong will."

Miss Elizabeth Coyle testified she had known Mrs. Ross for about twenty-five years, and had worked side by side with her at the Bureau during that time; that Mrs. Ross had informed her that she intended to give all her property to Dr. Gibson; that Mrs. Ross had a very strong will, and in the opinion of witness was of perfectly sound mind; that "she told me she had made a will; that she had left her property to Dr. Gibson."

Peter G. Stelle, an employee of the Bureau, testified he had known Mrs. Ross for about twenty years and worked in the same room with her all that time, and considered her of sound mind, and that testatrix said to him "her relatives never did anything for her, and she did not propose to do anything for them."

Mrs. Belle Dewey said she had known Mrs. Ross for about twenty-eight years in the Bureau, and that their desks were side by side; that Mrs. Ross told her that "when her daughter was an infant she was thrown on the world penniless. Had to walk to Bladensburg with her infant in her arms. Not a soul came forward to assist her. That she intended to cut out her relatives entirely and give her property to those who had been kind toward her. * * * She was as strong in mind and determination as the strongest rock that ever was built. You could not move her. I would say she was of sound mind. * * * She did not tell me that her relatives knew anything of her destitution."

Miss Fannie C. Elgin, who had known the testatrix at the Bureau a short time prior to her death, testified that she regarded Mrs. Ross as of sound mind, and that Mrs. Ross had informed witness that "none of her family had taken her in and provided for her at the time she had that baby. She never said she had asked them to take her in."

Mrs. Emma Miller said she had known Mrs. Ross at the Bureau for about five years prior to her death; that Mrs. Ross told her "she had been in want, and her relatives had never done anything for her, and for that reason she wanted her money to go to whoever she saw fit to give it, and she did not want her relatives to have anything she should leave. * * * I do not think there could be a person of more sound mind than Mrs. Ross. * * * She said 'I am not fighting mad with them (her relatives) or anything like that, but I know what it is to be in want, and now I don't want what these hands have worked for and my heart has bled for to go to people that have never given me a crust or knew whether I wanted bread or not. Now that I have worked and accumulated this I don't want it to go

to them;" that testatrix told witness "in September that she had a will drawn at the Loan & Trust Company."

Dr. Gibson, the caveatee, testified that at the request of Mrs. Ross he had taken charge of the removal of her daughter's remains from one section of the cemetery to another, and that she had said to him that "she could never repay him for that, and that he could not understand how little kindnesses of that kind were appreciated by a mother," and that he had said nothing to her about making a will, nor had she said anything to him about the matter.

The further material facts will be found stated in the opinion.—Reporter.

*Mr. Lorenzo A. Bailey* for the appellants.

*Mr. Andrew Wilson* and *Mr. Noel W. Barksdale* for the appellee.

Mr. Justice ROBB delivered the opinion of the Court:

The first assignment of error relates to the action of the trial court in overruling the motion of the caveators for a postponement of the trial. On April 4, 1906, the day the case was called for trial, the caveators asked for a continuance, and based their application upon petition and affidavit, the first of which states that Mrs. Susan Shaw, a sister and next of kin of the testatrix, Kate Ross, was living at Bennings, District of Columbia; that the premises were then quarantined because of the existence there of diphtheria; that the caveator, Alpheus E. Riddle, accompanied by his attorney, Lorenzo A. Bailey, went to the said premises on Sunday, April 1, 1906, for a conference with Mrs. Shaw concerning the testimony to be given by her in the case, and that, finding the house quarantined, they called upon Dr. Savage, who lived near by, and who informed them that the quarantine would be continued for about a week longer; that they expected to prove by Mrs. Shaw that Dr. Gibson had in-

formed her that he took Mrs. Ross to the office of the Washington Loan & Trust Company to have her will drawn; and that Dr. Gibson had made "diligent effort to induce the said Mrs. Shaw to oppose the said caveators and to withhold from them the information in her possession material to the issues in this case." Affidavit was also made by Mr. Bailey, as attorney for the caveators, in which he said that his clients could not safely proceed to trial without the testimony of Mrs. Shaw, "or at least until I shall have had an opportunity to confer with her in reference to the matters involved in the issues framed." Upon the filing of this petition and affidavit the caveatee produced an affidavit of Dr. Savage, in which he stated that Mrs. Shaw had been for some time past "sufficiently strong, mentally and physically, to have her deposition taken at her home; but she is not, has not been, and will likely never be, able to attend court and give her testimony. That the said home is not quarantined, and that persons can go in and out there without incurring the least danger of contracting or carrying the disease." Counsel for caveatee thereupon offered to waive any notice, and to proceed with counsel for caveators to the home of Mrs. Shaw, either before or after adjournment of court, and take her deposition. This offer was repeated at a later stage of the trial.

There is absolutely no merit in this assignment. The petition and affidavit are inherently defective in that they fail utterly to show that diligent effort had been made to consult this witness at a seasonable period before the trial, or that her testimony was material. John Riddle, Sr., who joined his counsel in signing this petition, was a brother of Mrs. Shaw, and subsequently testified that she was "in her eighties," and that she "had been in bad condition for the last twenty years with some physical ailment which confines her to the house most of the time." The record also discloses that on January 10, 1906, the day the issues were framed, the court ordered "that the trial of said issues be and the same is hereby fixed for the 24th day of January, 1906." On March 12, 1906, another order was made postponing the trial until April 3, 1906. Notwithstanding these orders, and notwithstanding the fact that the condition

of Mrs. Shaw must have been known to the caveators, and should have been known to their counsel, it does not appear that any effort was made to see her until a day or two before the trial. Moreover, it is inconceivable that Mrs. Shaw would have testified that Dr. Gibson informed her that he went with her sister, Mrs. Ross, when she made her will, because Mrs. Ross was alone when she went to Mr. Speare, who directed her to the trust company, and Mr. Eichelberger and Mr. Thompson testified that she was alone when she appeared at the trust company to have her will drawn, and when she subsequently returned there to execute it. It is not for us to speculate and surmise that Dr. Gibson advised Mrs. Shaw to withhold information from the caveators, when the petition does not even allege that any seasonable effort was ever made to obtain this information from her,—much less the character of the information in her possession. The discretion of the court in overruling the motion for a continuance was rightly exercised, and will not be disturbed. *Isaacs* v. *United States,* 159 U. S. 487, 40 L. ed. 229, 16 Sup. Ct. Rep. 51.

The second assignment of error is based upon the ruling of the court allowing the answer of witness Thompson to the question whether at the time Mrs. Ross signed the will he had "any way of knowing that that was Kate Ross, except that she signed her name as Kate Ross," to stand. We think the answer, "By comparison of signatures," warranted and responsive to the question which was asked in cross-examination, and which was broad and general.

There is no merit in the third assignment of error, which involves the ruling of the court admitting the will in evidence. Whether the testimony at that time was sufficient, without more, to warrant the action of the court, is not material, because at a later stage of the trial ample evidence was introduced to fully establish the identity of the testatrix. Witness Speare, whose office was not far from the Loan & Trust Company where Mrs. Ross had her will drawn, and who had known her for many years, directed her there for that purpose, and her disclosures to him as to the disposition she intended to make of her prop-

erty exactly coincided with the terms of the will. To complete the identity, Mrs. Lochte testified that Mrs. Ross, whom she had known for several years, had informed her of her interview with Mr. Speare, that she had made a will and left everything to Dr. Gibson. The testatrix made a similar statement to Miss Coyle, and informed various other witnesses as to what disposition she had made of her property. This testimony, taken in connection with the testimony of the subscribing witnesses, we think conclusively established the identity of Mrs. Ross.

The fourth assignment of error is based upon the exclusion by the court of the testimony of Charles Riddle and Richard F. Anderson in rebuttal. Charles Riddle stated that he had heard the testimony in regard to what Mrs. Ross said about her destitution and about carrying her baby to Bladensburg in her arms. He was then asked: "State whether, so far as you know, you ever had any information that that statement was true." The court declined to permit the witness to answer this question; whereupon counsel for caveators said: "I want to show whether or not the relatives had any knowledge of any such condition of things as depicted by any such statement of her having to go to Bladensburg on foot." The court still declining to admit the answer, counsel further stated that he offered to prove that the witness "at that time was in a position to know whether or not his aunt was in any such condition of destitution, and whether or not any of her relatives had treated her in the way in which they are said to have treated her by the evidence that the other side have put in, and if it was true that none of them knew anything about it." There are several objections to this testimony. A sufficient one is that caveators in their evidence in chief having based their objection to the allowance of the will solely upon the fact that Mrs. Ross was prejudiced against them and other relatives because she believed they had not helped her when she was in need, they should *then* have introduced this testimony, if it tended to show that her prejudice was fanciful and amounted to a delusion. Another objection is that the caveatee's witnesses did not testify that Mrs. Ross had said that her relatives *knew* of her destitution.

The testimony was not, therefore, proper rebuttal. A still further objection is that the offer was too indefinite and general. Counsel merely offered to show that the witness was in a position to know whether what Mrs. Ross had stated was true. What the answer of the witness would have been must be surmised by the court. "There is nothing to show what the testimony of the defendant would have been if admitted, or what the defendant offered to prove thereby, or that it would in any respect have been material, and for this reason also an exception to its exclusion cannot be maintained." *Hathaway* v. *Tinkham,* 148 Mass. 85, 19 N. E. 18; *Dreher* v. *Fitchburg,* 22 Wis. 675, 99 Am. Dec. 91; *Jackson* v. *Hardin,* 83 Mo. 187; *Savary* v. *State,* 62 Neb. 168, 87 N. W. 34; *Keffer* v. *State,* 12 Wyo. 49, 73 Pac. 556; Abbott, Trial Brief, 49; *Shinners* v. *Locks & Canals,* 154 Mass. 168, 12 L.R.A. 554, 26 Am. St. Rep. 226, 28 N. E. 10. What has been said about the testimony of witness Riddle is equally applicable to that of witness Anderson.

The fifth and most important assignment of error is based upon the ruling of the court in directing a verdict in favor of the caveatee upon each of the said issues. The caveators contend that there is evidence that Mrs. Ross at the time of the execution of the will was not of sound and disposing mind and capable of executing a valid deed or contract, because she was suffering from insane delusions with respect to her relatives. In the argument at bar it was not contended that the record contains any evidence tending to show undue influence or fraud, and those issues are therefore to be regarded as abandoned.

The right of the trial court to direct a verdict, when the evidence introduced at the trial, with all the inferences that the jury may justifiably draw from it, is insufficient to support a verdict, is too well settled to admit of discussion. *Ford* v. *Ford,* 27 App. D. C. 401, 6 L.R.A.(N.S.) 442; *Scott* v. *District of Columbia,* 27 App. D. C. 413. The question, therefore, to be determined, is whether there is any evidence in the record that Mrs. Ross was suffering with such an insane delusion regarding her relatives as rendered her incapable of testamentary capacity. "Mere eccentricities do not justify setting aside a will on the

ground of mental incompetency. \* \* \* ·A testator may be eccentric, opinionated, peculiar, and yet may be a shrewd man of business, capable of managing his own affairs and disposing of his property by deed or will. Mere eccentricities, prejudices, or resentment against one or more relatives, without more, cannot invalidate a will." *Robinson* v. *Duvall,* 27 App. D. C. 546. We take it that an insane delusion exists when a person conceives the existence of something fanciful and extravagant, something having no foundation in reason or fact, and is dominated and controlled by such imagination, and therefore acts as he would not otherwise have acted. *Middleditch* v. *Williams,* 45 N. J. Eq. 726, 4 L.R.A. 738, 17 Atl. 826; *Carpenter* v. *Bailey,* 94 Cal. 406, 29 Pac. 1101; *Re Kendrick,* 130 Cal. 360, 62 Pac. 605; *Robinson* v. *Adams,* 62 Me. 401, 16 Am. Rep. 473; *Guiteau's Case,* 10 Fed. 170; *Benoist* v. *Murrin,* 58 Mo. 307. The only evidence offered in this case that Mrs. Ross was suffering from an insane delusion prior to and at the time she executed her will is the testimony heretofore detailed, to the effect that when her husband deserted her, and when her daughter died, her relatives did not manifest that degree of interest in and solicitude for her that the situation required. One of her brothers testified that he did not even know her husband, when his sister was married, or what became of her husband, although he (the witness) was living in Washington at the time. The other brother admitted that his sister had never been in his house in her life; and neither brother testified to having assisted, or to having offered assistance to, his sister at any time or in any manner. It is safe to assume that, having introduced evidence that Mrs. Ross was displeased because of their lack of interest in her and sympathy for her when she was in trouble, they would have testified to any assistance rendered or offered her had they been able to do so. The testimony they did give tended to support and corroborate the statements of Mrs. Ross, and from all the testimony we conclude that caveators manifested much greater interest in the small estate left by this lonely woman—an estate she accumulated by patient toil—than they ever did in her. While she was not "fighting

mad with them," as she expressed it, she did feel that she had a right to ignore them as they had ignored her, and leave her small savings to those who had been kind to her. We cannot say that this even tended to show that she was laboring under an insane delusion, for, if we should, we would be running counter to the laws that govern human action. We fail to find a scintilla of evidence upon which a verdict for caveators might have been predicated, and we therefore affirm the action of the court below in directing a verdict.

The judgment is affirmed, with costs.          · *Affirmed.*