[S. F. No. 6546.   Department Two.—May 12, 1914.]

In the Matter of the Estate of MARY P. MacCRELLISH, Deceased. JENNIE S. HAMMITT et al., Contestants and Respondents, v. WILLIAM P. EDWARDES et al., Proponents and Appellants.

WILL—MENTAL INCAPACITY OF TESTATRIX—EVIDENCE INSUFFICIENT TO SHOW.—On this appeal from a judgment revoking the probate of a will on the ground of the mental incapacity of the testatrix, it is held that, under the evidence, the trial court should not have allowed the issue of unsoundness of mind to go to the jury, and that the burden of proving unsoundness of mind, which rested upon the contestants, had not been sustained by them.

ID.—HALLUCINATIONS NOT AFFECTING OBJECTS OF TESTATRIX BOUNTY—WANT OF IMPAIRMENT OF NORMAL TESTAMENTARY CAPACITY.—Proof of mere hallucinations by a testatrix, having no relation to the objects of her bounty, which do not indicate an impairment of the normal testamentary capacity, is not sufficient to overthrow a solemnly executed will.

APPEAL from a judgment of the Superior Court of Alameda County revoking the probate of a will, and from an order refusing a new trial. F. B. Ogden, Judge.

The facts are stated in the opinion of the court.

McGowan & Westlake, for Appellants.

Snook & Church, for Respondents.

MELVIN, J.—Certain of the heirs of Mary P. MacCrellish, deceased, successfully contested and secured judgment for revocation of the probate of a document which had been executed as her last will and testament. One of the grounds of contest was undue influence alleged to have been exerted by William P. Edwardes and Mary W. Edwardes, the appellants, but a nonsuit was granted in their favor regarding this ground. Upon the other ground,—namely, the alleged incapacity of the testatrix, the jury found in favor of the contestants and this appeal is by proponents from the judgment entered in accordance with said verdict and from the order denying a motion for a new trial.

Appellants specify several alleged errors, but we find it necessary to consider only their contention that the evidence was not sufficient to support the verdict.

The will was in due form and was properly witnessed by men who testified at the trial to their firm belief in the testamentary capacity of Mrs. MacCrellish at the time the instrument was executed. The will was a simple and by no means an unnatural one. The contestants were Mrs. MacCrellish's nieces and nephew of the half blood. They resided in Philadelphia and were not upon terms of close intimacy with Mrs. MacCrellish. By the will their mother was bequeathed the sum of one hundred dollars and a like amount was to go to each of them. To her husband's nephew, Dr. A. C. Peterson, she bequeathed one thousand dollars and to her business agent, H. M. Wooley, five hundred dollars. Her "beloved sister Martha V. Woodward" was mentioned in the will but was left nothing on the ground that Mrs. Woodward was "already well provided for." The residue of the estate was to be divided as follows: To Mrs. Edwardes, her niece with whom she had lived for some years, one-half; to the grand nephew

of testatrix, Vance P. Edwardes, one-tenth; to a grand niece, Helen Kaufman, one-tenth; to a nephew, Thomas B. Woodward, and a grand nephew, Robert S. Woodward, each one-twentieth; to a grand niece, Isabel Melsted, one-tenth, and to Ethel Glenn, another grand niece, one-tenth.

The witnesses to the will were Rod W. Church and H. F. Whitney. The former had not met Mrs. MacCrellish before the occasion when the will was signed, but he talked with her and asked her some questions regarding the will. Her demeanor and her answers convinced him that she was of sound mind. The other witness, Wm. P. Whitney, one of the appellants, had drawn the will from memoranda furnished by Mr. Edwardes, and had given the paper to Mr. Edwardes the day before it was signed. He had met Mrs. MacCrellish a few times before the third day of January, 1911, the date of the execution of her will. Like Mr. Church, he was of the opinion that she was of sound and disposing mind and memory on that day. Two other witnesses not interested in the outcome of the contest testified very strongly to Mrs. Mac-Crellish's sanity and capacity to make a will. Dr. John Kastendieck, who had known her well and had formerly been her medical adviser, saw her on the Christmas day before the execution of the will. His visit was of a social nature and he found her in excellent health and spirits. Though an aged woman who had lived eighty-two years, she was strong mentally, and he considered her amply qualified to make a will. Mrs. Jessie Walker, who had known her well for years, last saw Mrs. MacCrellish in February, 1911. She testified most positively to the old lady's excellent mental condition. Mr. Edwardes, the only other witness for the proponents, was the executor of the estate. He was also of the opinion that the will was the deliberate product of a sound and disposing mind. Opposed to this testimony was that of Dr. Peterson, one of the legatees who was a nephew of the deceased husband of the testatrix, and Mr. H. M. Wooley, another legatee, who had been Mrs. MacCrellish's business agent for some years. Dr. Peterson testified that he had noticed peculiarities and conduct out of the ordinary on the part of his aunt from time to time after the fire of 1906. His testimony, however, is descriptive of an old lady, wanting an acute memory, perhaps, and doubtless somewhat peculiar, but not altogether without

testamentary capacity. Speaking of her condition at a time between 1906 and her death in 1911, he said: "A great deal was due to her lack of memory, and condition of mind at that time. For instance, I used to give her some straight talk when I first went there, and about an hour afterwards she would broach the same thing that evidently had passed entirely from her mind, forgotten all about it." Mr. Wooley was the principal witness on behalf of the contestants. He said that before the fire Mrs. MacCrellish was a strong-minded, highly educated woman. Prior to 1906 he spoke to her about making a will but she said she did not desire to make one at that time. In March, 1910, he submitted to her the skeleton of a will which gave to the Hammitts about the same amount which was assigned to them in the will which was afterward probated, but there was no provision in the skeleton will showing the proportion which was to be bequeathed and devised to Mrs. Edwardes, Dr. Peterson, or Mr. Wooley. Regarding this memorandum witness testified as follows: "At the time I submitted this pencil memorandum or skeleton of a will to Mrs. MacCrellish we were alone. I told her that Mr. Edwardes had spoken to me, and that it was his wish and Mrs. Edwardes' wish, and my own advice, that she should do something to get her affairs straightened out, and she asked me what I thought she ought to do, and I told her I thought she ought to make a will, and then I told her of the talk I had had with Mr. Edwardes, and submitted this outline that I have already referred to to her. She looked through the will and said that the form of it did not suit her, that is, the disposition of the property did not suit her; that she wanted to add to the will a special bequest to Vance Edwardes, who is the son of Mr. and Mrs. Edwardes, as she was very fond of him. She also said that she wanted to leave a special bequest to Dr. Peterson and myself, and then to divide the balance of the estate into three parts, one part for Mrs. Edwardes, one part for Mr. Tom Woodward, and one part to be divided among the eastern heirs, and she said they were her half-brother's children and she wanted them to be so remembered. This conversation was held in the early part of March, 1910, and in my opinion her mind at that time was perfectly sound." He also said that Mrs. MacCrellish had suffered from a cerebral congestion, resembling apoplexy

about the year 1905, but had entirely recovered. About the middle of 1910 Mr. Wooley noticed a change in Mrs. Mac-Crellish. Of this he said: "That was along about the middle of 1910 that I first observed that condition. Aside from that I noticed that I would tell her something and she would in a little while after, maybe in the same day, or something I told her in the previous visit, she would forget that I ever told her anything about it. At that time she was living with the Edwardes at 412 Oakland Avenue, in Oakland. From that time until the time this will is claimed to have been executed on the third day of January, 1911, what I have told you about covers anything out of the ordinary that I noticed in what she said, except on one or two occasions when I was there, she claimed that there was a man in the room, and once or twice she had me go out in the hall to look for a man. There was no man there. It was somewhere between July and December, 1910, that this condition first manifested itself. From that time on I think that occurred in my presence, I think twice. The second time that occurred right along there in that period. The instance I recollect particularly is we were sitting in the dining-room and she says, 'There is a man out there,' and she said, 'You listen and you will hear him.' And presently she said, 'Go out and see.' And I went out and looked all around the place and there was no one there. I don't remember just who was present at that time, but some members of the Edwardes family, and on another occasion I think Vance did the same thing. On this particular occasion to which I have referred, it was about six o'clock in the evening. I don't know that at that time she also told me there was a man that was watching her that was trying to get in her room at night. She told me that several times, two or three times, during the last six months of her life. She also said she got messages slipped under her door and expressed fears of being watched and being robbed. I cannot remember her language, but that was the substance of what it was." Nevertheless Mr. Wooley continued his efforts to get her to make a will, and on the first of January, 1911, at Mr. Edwardes' suggestion he went to see her for that purpose. She seemed to be dazed he said, but was sitting up. The members of the family present told him that they did not think the old lady would recognize him. Of this visit he tes-

tified that after she had been aroused out of a "sort of stupor" he went and sat by her and asked her how she was. At first she did not recognize him, but after a minute or two she brightened up and seemed to know him. They had a very brief conversation. On the following evening Mr. Wooley returned to the home of the Edwardes' family. The best idea of this visit may be obtained from a quotation of the following portion of his testimony: "I don't remember the preliminary conversation. What was talked of before—that is immediately before I started to talk with Mrs. MacCrellish about the will. I had been—he asked me in the morning to come over there and get her to make the will, and that was my business there that night and I sat down to talk with her about the will. I told her, Mrs. MacCrellish, that Mr. Edwardes had asked me to speak to her about it, that he thought she ought to get her affairs in shape, and I thought myself that if she wanted to make a will she ought to do so. She started to cry. She said, 'I can't make a will. I haven't got twenty-five cents. Here I haven't got the money to pay Mrs. Edwardes my board. Now I can't do anything about that until we get the money from Mr. Lewis.' Mr. Lewis is the man to whom the mining property had been bonded. She had property at that time; she had some flats in San Francisco and property in Marin and El Dorado counties, some vacant property in San Francisco and property in Mariposa County. The flats in San Francisco were located at Jones and Bernard streets, and they were partly rented at that time. She had not been receiving much income from the property for quite awhile. They had been only partly rented and there were a great many expenses during that year." After some further conversation Mr. Wooley told Mr. Edwardes that there was no use talking to Mrs. MacCrellish any longer. Mr. Wooley then went away. On the following day Mrs. MacCrellish executed the will which has been attacked by contestants. Summing up his reasons for believing the testatrix was mentally incompetent at the time of making the will, Mr. Wooley said: "I base that opinion on the condition of her mind that I had observed; her actions and her talk that I had observed in the last six months of her life, during nearly all of that time, she was not fit to do business during the last six months. She could answer questions, but so far as being

able to do anything or make any plans or anything of that kind, she was not able to do it. When I speak of acts and talks that constitute a basis or in part a basis for my opinion as to her mental condition, I refer to the fact of her seeing men around that were not there. My other reasons for basing my opinion are the fact of her starting in to tell me something and dropping off in the middle of her talk and not being able to finish it; forgetting what she was talking about while she was talking, and the facts of my telling her something during the conversation and she asked me the same question several times in one conversation after having been answered; also the fact of her physical condition when I saw her—particularly speaking when I saw her on the first of January, she was in a dazed condition and she could barely recognize me, and when I saw her on the second of January, when I went there to get her to make a will, and asked her about it, she started in to cry like a child and said she didn't have anything and couldn't make a will until she got the money from Mr. Lewis.''

Mr. Edwardes corroborated Mr. Wooley with reference to the old lady's hallucinations upon the subject of the supposed presence of men in the house and the desire of some one to rob her.

From an examination of all of this evidence we are convinced that the court should not have allowed the issue of unsoundness of mind to go to the jury. The presumption of sanity exists in favor of a testatrix and upon the contestant rests the burden of proving unsoundness of mind. (*Estate of Dolbeer*, 149 Cal. 230, [9 Ann. Cas. 795, 86 Pac. 695].) This burden has not been sustained by the contestants. The most that can be said of the testimony of Dr. Peterson and Mr. Wooley, giving it, as we must, the interpretation most favorable to contestants (*Estate of Arnold*, 147 Cal. 583, [82 Pac. 252]) is that Mrs. MacCrellish was suffering from some of the infirmities of old age and that she was afflicted with certain hallucinations having no relation to the objects of her bounty.

It has long been the rule in this state that proof of such imaginings which do not indicate an impairment of the normal testamentary capacity is not sufficient to overthrow a solemnly

executed instrument such as the one we are now considering. (*Estate of Kendrick,* 130 Cal. 364, [62 Pac. 605].)

Evidently the witness Wooley did not consider the old lady incompetent because of these ideas that men were hiding near her, spying on her and wishing to rob her. He urged her to make a will after he had observed these idiosyncrasies. The fact that she seemed dazed for a few moments on the first day of January, 1911, when he spoke to her, did not convince him of her incapacity, because the next day he returned to the task of seeking to induce her to make a will. We do not say this in criticism of Mr. Wooley nor do we assume to weigh his testimony. We merely mention his conduct as that of the normal individual and to illustrate the impression which such facts as he mentioned would naturally make upon one in his relation of intimacy and confidence with the old lady. Neither did her weeping and her declaration on January 2, 1911, that she had no money amount to a showing that she lacked the power to dispose of her property intelligently on the following day. Some mining property which she regarded as very valuable had been bonded by Mr. Lewis and it was natural for her to be disappointed and to mourn because he had not felt justified in purchasing it. It is true that at that time her other property was not very remunerative and well may it have been true that she spoke in a comparative sense when she said she had no property and could not make a will until she heard from Mr. Lewis. The evidence in this case is very much weaker than that held insufficient to justify the setting aside of the wills in other cases decided by this court. It is unnecessary to do more than to cite the following authorities in support of this statement: *Estate of Chevallier,* 159 Cal. 167, [113 Pac. 130] ; *Estate of Packer,* 164 Cal. 528, [129 Pac. 778] ; *Estate of Purcell,* 164 Cal. 305, [128 Pac. 932] ; *Estate of Kendrick,* 130 Cal. 363, [62 Pac. 605].

The judgment and order are reversed.

Henshaw, J., and Lorigan, J., concurred.

Hearing in Bank denied.