[S. F. No. 7202.   Department Two.—June 11, 1915.]

In the Matter of the Estate of ROBERT CLARK, Deceased. ELIZABETH JOHNSON TRAVIS et al., Appellants, v. FLORENCE STRAUS, Executrix of the Last Will and Testament of Robert Clark, Deceased, Respondent.

WILLS—TESTAMENTARY CAPACITY—FINDING SUPPORTED BY EVIDENCE IN THE CASE.—A finding that the testator had testamentary capacity, although it appeared that he was infirm from age, was part of the time in a semi-comatose condition, and had not strength to sign his name to the will, and assented to its provisions when they were read to him by nodding his head, is held to be supported by the evidence.

ID.—UNDUE INFLUENCE—FINDING SUPPORTED BY EVIDENCE IN THE CASE. The evidence in this case supports the finding that the will was not made as the result of undue influence upon the part of the testator's physician or his lawyer who urged upon him the propriety of making his will in view of his condition of health.

ID.—EXECUTION—FINDING SUPPORTED BY EVIDENCE IN THE CASE.—The finding that the will was legally executed is supported by the evidence although it appears that the testator made his wishes known partly by pantomime and partly in answer to questions and the mechanical work of affixing his name to the will was performed by another.

APPEAL from an order of the Superior Court of the City and County of San Francisco refusing to revoke the probate of a will.   J. V. Coffey, Judge.

The facts are stated in the opinion of the court.

Frank R. Wehe, and C. S. Morbio, for Appellants.

J. W. Henderson, and F. J. Kierce, for Respondent.

MELVIN, J.—This is an appeal by certain nephews and nieces of Robert Clark, deceased, from an order of the superior court of the city and county of San Francisco refusing to revoke the probate of the will of said Clark.

The proponent and executrix of the last will of said Clark is also a niece.   All of the petitioners reside outside of the state of California.   Florence Straus, executrix of the will and respondent here, is and long has been a resident of Los Angeles.

Appellants frankly admit that there was a serious conflict of evidence at the hearing of the petition for revocation of the probate of the will, but they ask a reversal of the order denying their prayer upon the ground that in any aspect of the evidence it was totally inadequate to support the conclusion reached by the probate court.

The three grounds of the contest by appellants were: 1. That the will was procured by fraud and undue influence; 2. That at the time of executing the will the testator lacked testamentary capacity; and, 3. That the will was not executed according to law.

The court found against all of these grounds of contest. The finding with reference to the affectionate regard in which the testator held his niece Mrs. Straus so thoroughly and briefly sums up the testimony of the witnesses who appeared for the respondent that we need do no more than quote it. The court found: "That said Florence Straus is a niece of said Robert Clark, and the only one of his heirs residing in the state of California; that said Robert Clark held the said Florence Straus in affectionate regard; and upon the death of his wife, Mary Clark, about three weeks previous to his own death, the said Robert Clark sent a telegram to the said Florence Straus, who resided in the city of Los Angeles, state of California, advising her of the death of his said wife, and asking her to come to him at once. That said Florence Straus immediately came to San Francisco, and remained with the said Robert Clark until his death. That the said Robert Clark, did shortly after her arrival cause the money on deposit in the said German Savings Bank and Loan Society to be deposited in the names of Robert Clark and Florence Straus and made the same payable to the order of either or the survivor of either; that on the thirteenth day of April, 1912, said Robert Clark became ill and on the fifteenth day of April, 1912, for the purpose of better caring for him, the said Robert Clark was, by order of his physician, removed to the Hahnemann Hospital, in which he remained until his death." The money to which reference is made in the foregoing finding was something more than thirteen thousand dollars in the aggregate.

Robert Clark at the time of his death was eighty-four years of age, yet according to the testimony of even some of the witnesses for the contestants he was in good health for a man

of his years up to a time within a few days of his death. **On**
April 14, 1912, he received notice from the board of health that
certain debris in the cellar of his home must be taken out and
burned.   He personally removed some of this material.   He
then took a seat on a piece of wood or block in his back yard,
and after sitting there for a short time he collapsed and sunk
into a fainting condition from which he was revived with
difficulty by the neighbors who carried him into the house.
On April 15th, by order of his physician, he was removed to
Hahnemann Hospital, where on the evening of that day be-
tween five and six o'clock the instrument afterward admitted
to probate as his will was executed.   He died shortly after
nine o'clock the following morning.

The will was prepared by Mr. J. W. Henderson, an attorney
at law, who testified that he first met Robert Clark about three
weeks prior to the latter's death.   Mrs. Straus had asked Mr.
Henderson to see her uncle with reference to his wife's estate.
After some discussion of the affairs of Mrs. Clark's estate and
of the threatened action on the part of some of Mr. Clark's
relatives to have a guardian appointed for the old man, the
attorney, at his client's request, asked Mrs. Straus to leave the
room.   They then discussed the disposition of Mr. Clark's own
property and Mr. Henderson advised the execution of a will
rather than any arrangement for the passing of title by deed.
Of this interview Mr. Henderson testified, in part, as follows:
"I asked him about the way he would like to have his will
prepared, and he said he would like to have it go to Mrs.
Straus.   He was definite about it.   I told him that if he
desired the will that way I would prepare the will and bring
it out to him for execution.   He said, 'Not now.'   I asked him
when he wanted to do it.   He said, 'After a while, I am not
going to die yet.'   I did not press him any further about it.
I said nothing further about that matter."   After Mr. Clark
was taken to the hospital Mr. Henderson was notified of that
fact by a telephonic message either from Mrs. Straus or from
the attending physician, and after preparing a will in ac-
cordance with the wishes expressed by Mr. Clark regarding
the disposition of his property when he should be ready to
make a will, the attorney accompanied by Mr. Botts, a gentle-
man connected with his office, went to see the sick man.   After
Mr. Henderson entered the room of Mr. Clark, the invalid
spoke to him, smiled and grasped his hand.   Asked by the

lawyer how they were "using" him at the hospital, he said "all right" or something of that kind.   Asked if he wanted to make his will Mr. Clark said "No" very emphatically.   "I called his attention," said Mr. Henderson, "to the fact that he was very ill, and that if he was going to make a will at all he had better consider it now.   I did not say anything further regarding it.   I stepped back, because I did not care to press anybody to make a will.   The doctor stated to him then that he was a very sick man, and that he possibly had not forty-eight hours to live; that if he had any business to transact that he desired to transact before his death that he would advise him to do so now; that while he might live longer than that and might recover and be well again, that he could not assure him that he would.   This seemed to have some influence on the old gentleman's mind, and I again asked him if he desired, under those circumstances, to execute the will in accordance with our conversation.   I told him that I had prepared the will in accordance with his desire expressed to me at his home.   He said then that he desired to make his will."   The will was then read to him and he was raised up, a book was placed in front of him and he attempted to sign his name to the will which was put thereon.   He seemed to be unable to control the pen which had been placed in his hand and a pencil was substituted but with no better results.   Mr. Henderson then asked if he desired to have his name signed for him and he indicated a desire to have that done.   Someone guided his hand in making a cross and the name "Robert Clark" was written by Mr. Henderson.   According to Mr. Henderson's testimony, testator declared the instrument to be his will and at his request Mr. Botts and Mr. Henderson signed it as witnesses with due formality.   Mr. Henderson testified that Robert Clark was of sound mind at the time of executing the instrument.   He was corroborated in nearly all of the essential particulars of his account of the occurrences in Robert Clark's room at the hospital by. Mr. Botts, Mrs. Straus and Doctor Freyermuth.   It would serve no good purpose to quote or to summarize their testimony further, except to discuss portions of the physician's account of the mental condition of his patient at the time of the signing of the will, because appellants insist that his testimony indicates clearly a state of incompetence on the part of the testator to express any wish concerning the disposition of the property.   It is

true that according to the account of the witnesses who had stood at the bedside, some of Mr. Clark's wishes were expressed by affirmative signs made in response to questions, but this fact does not invalidate the will. A will made by interrogatories may be valid (Williams on Executors (7th ed.), p. 57; 1 Underhill on Wills, sec. 204; *Denny* v. *Pinneys Heirs,* 60 Vt. 524, [12 Atl. 108]; *Robbins* v. *Robbins,* 50 N. J. Eq. 742, [26 Atl. 673]), and while it is true that where a will has been so made the court will always use care to require proof of spontaneous action and volition on the part of the testator, we cannot say that in this case the conclusion reached was not justified.

Doctor Freyermuth who had attended Mrs. Clark had told him at the time of her death when the aged man was downcast that he had ten years to live. When the doctor spoke to his patient in the hospital and advised him to make some disposition of the property, he did not care to sign any will then, perhaps having in mind the physician's former assurance of a long life. However, the doctor told him that he was a very sick man and that the morrow might be too late. Then, according to the physician's testimony, Mr. Henderson asked Mr. Clark if he wished to sign the will as he had prepared it. So it was read aloud to the testator, section by section, very distinctly. Mr. Henderson asked him if that was what he wanted and he nodded and spoke "Yes." The physician's account of the sick man's efforts to affix his name to the instrument and the subsequent signing of the will by Mr. Henderson agrees substantially with the testimony of the other witnesses. In answer to the usual question, "Was he of sound or unsound mind at that time in your judgment," the physician said: "He was absolutely of sound mind." The doctor stated further that, at that time, his patient's mental condition was unimpaired; that Mr. Clark was rational and that after he had been brought to the hospital and before the execution of the will the condition of the old man improved slightly. It also developed in the examination of Doctor Freyermuth that frequently before the witness had ever met Mrs. Straus, and notably on an occasion shortly after Mrs. Clark's death, Mr. Clark had said that he wanted "Florence" (Mrs. Straus) to have his property. Appellants assert that all of the physician's testimony on direct examination was nullified by his admission on cross-examination that his patient was in a

"partially semi-comatose condition," after he had been taken to the hospital. But this testimony was quite consistent with Doctor Freyermuth's other statements, because he did not testify that the state of partial coma continued during *all* of the time between the arrival of the patient at the hospital and his death. That testator was an old man and a very feeble man, there can be no doubt, but we cannot say, as matter of law, that in view of the testimony in all of its bearings he was lacking in testamentary capacity. The burden of proving unsoundness of mind was on the contestants. (*Estate of Dolbeer,* 149 Cal. 230, [9 Ann. Cas. 795, 86 Pac. 695].) The infirmities of old age were not sufficient in themselves to establish lack of testamentary capacity (*Estate of MacCrellish,* 167 Cal. 717, [L. R. A. 1915A, 443, 141 Pac. 257]), and in view of the positive testimony of the witnesses who saw the execution of the will that Mr. Clark was of sound and disposing mind, we think the finding of the court on that subject was amply supported.

Nor can we agree with appellants in their argument in support of their theory that under the evidence the will must have been procured by fraud and undue influence. It is not an unnatural will. It followed the contemplated disposition of his property which the testator had discussed with his physician and his legal adviser. Mrs. Straus was the one person for whom he sent when his wife died, and after he was taken to the hospital, as the attending nurse testified, he was somewhat impatient until Mrs. Straus arrived, but after her advent he became quiet and apparently contented.

Much appears in the briefs of appellants on the subject of the alleged persuasions and importunities of the doctor and the attorney which, it is affirmed, must have amounted to undue influence upon the mind and volition of the testator. The evidence falls far short of establishing that sort of sinister influence which sometimes operates to produce an instrument which is not the will of its supposed maker. These gentlemen were Robert Clark's advisers. The mere advice to make a will which they gave to the old man, instead of exhibiting a desire to defraud, cajole or mislead him, would rather indicate a laudable wish that he who was the client of one and the patient of the other, should put his affairs in order before his departure from this world, which in the nature of things could not be long postponed for

a man of his age and infirmity. It can hardly be said in view of the evidence that these witnesses must have been co-conspirators of Mrs. Straus, trying to aid her in snatching her uncle's fortune from his other kindred. It was shown that she met them both after her aunt's death when she came from Los Angeles in answer to her uncle's summons. When Mr. Clark wanted an adviser to aid him in the settlement of his wife's estate Mrs. Straus was directed to Mr. Henderson by the widow of the former pastor of the church which her aunt had attended. She herself swore that she had never importuned her uncle to make a will in her favor. The fact that advice was offered to Mr. Clark, taken in connection with the activity of Mrs. Straus in securing counsel for him, fails to establish that sort of undue influence which must be shown before a court will overthrow a solemnly executed will. The evidence utterly fails to reach the dignity of proof of that sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of the testamentary act. Without such proof no will should be held invalid on the ground of undue influence. (*Estate of Gleason,* 164 Cal. 756, [130 Pac. 872] ; *Estate of Carithers,* 156 Cal. 428, [105 Pac. 127] ; *Estate of Lavinburg,* 161 Cal. 543, [119 Pac. 915] ; *Estate of Kilborn,* 162 Cal. 11, [120 Pac. 762].)

There was ample testimony to support the finding of due execution of the will, including the declaration which Mr. Henderson said the testator made, that the instrument subsequently probated was his last will. Neither the fact that testator made his wishes known partly by pantomime and partly in answer to questions, nor the circumstance that the mechanical work of affixing his name to the will was performed by another serves to invalidate the instrument. (*In re Mullin,* 110 Cal. 258, [42 Pac. 645].)

In accordance with the views expressed above we are of the opinion that the decision of the superior court and the order made and the decree entered were without substantial error.

The order is affirmed.

Henshaw, J., and Lorigan, J., concurred.