[Civ. No. 7423.   Third Dist.   Feb. 28, 1948.]

Estate of MARY ELIZABETH SELB, Deceased.   BERTHA ELIZABETH MORRIS, Respondent, v. THEODORE SELB, Appellant.

C. Ray Robinson, W. Eugene Craven and Margaret A. Flynn for Appellant.

V. F. Gant for Respondent.

ADAMS, P. J.—Mary Elizabeth Selb died September 12, 1945, at the age of 93 years, leaving a will dated March 18, 1944, in which she named her son, Theodore Selb, executor. Probate of said will was contested by decedent's daughter, Bertha Elizabeth Morris, on the ground that decedent was not of sound mind when she executed same and that she was

under the undue influence of her said son. The cause was tried before a jury which returned a verdict that decedent was not induced to sign the alleged will by means of undue influence, but that at the time of its execution she was not of sound and disposing mind. From the judgment thereafter entered denying probate this appeal was taken, it being contended by appellant that no evidence of lack of testamentary capacity was adduced and therefore a motion made by him for a directed verdict should have been granted, and that the evidence does not support the verdict. Reversible error is also predicated upon the giving of an instruction as to insane delusions which it is contended was erroneous.

The evidence shows that appellant and respondent were the only children of decedent, and her only heirs at law, her husband having predeceased her in 1929. Decedent was at the time of her death the owner of a farm in Missouri, and property in California consisting of a home located on a 5-acre tract about 5 miles from Modesto, a small amount of cash, and personal belongings located in the home. For about 13 years prior to her death her son had resided with her on the home place, he having in 1921 suffered a permanent totally disabling industrial accident for which he was drawing compensation in the amount of $7.89 weekly. Contestant lived in Modesto.

Decedent's will, which was drafted by Attorney Hoover in his office in Modesto, recited that testatrix was the owner of the property above mentioned and that her son and daughter were her only children. By the terms of the will the farm in Missouri was devised to the son and daughter in equal shares. Mrs. Morris was given $500 in cash "to be raised from, or upon the security of," the property in California, and the residue was left to Theodore Selb; but it was provided that decedent's funeral expenses and expenses of last illness should be paid from funds to be raised or deducted in equal shares from property given by the will to the son and daughter, respectively. The testimony of the attorney who drafted the will was to the effect that decedent had come to his office, had told him what she wanted put into the will, and that he had drawn it up according to her instructions; that though the testatrix was not hale or strong physically, she was "quite perky and snappy in a conversation," did not have any difficulty in telling him what she desired to have contained in the will,

and was "very definite and certain as to just how she wanted her will prepared"; and that he saw nothing to make him question her clear-mindedness. The subscribing witnesses to the will were a Mr. and Mrs. Harris. Mrs. Harris had died before the contest was instituted but Mr. Harris testified that on the day before the will was executed Mrs. Selb, with her son, had walked over to his home which was situated about a mile from the Selb place, and had asked him to take her into Modesto to witness her will; that the following day he did so; and that when Mrs. Selb signed the will "her mind was keen, she was right up to date," "she was a bright woman," she was "allright." There was other testimony tending to show mental capacity of decedent.

Testimony relied upon by contestant as showing general testamentary incapacity on the part of the testatrix need not be recited in detail. That set forth and relied upon in respondent's brief amounts to no more than that the testatrix was very old and had deteriorated mentally and physically; that at one time she had asked her grandson to write a letter for her to her son who was away from home because ill of a heart attack, she had not given the grandson any specific directions as to what he should write, and that, though the letter was not written, decedent had later stated that it had been written and mailed; that she kept repeating how awful the war was; that she was forgetful; that she was entirely different from what she was 60 years before, and appeared to have failed mentally and physically; that she and her house were untidy, and dirty; that during the last two years of her life she failed greatly in appearance and memory; that at times she would not recognize her friends; that she seemed "rattled" and when staying with her daughter in January, 1944, just wanted to go home and would not talk of anything else; that she did not seem to remember one of her grandson's children; that she was frail and feeble; that during the year 1943 she failed physically, and once "weaved" as she walked; that her house was filthy and musty.

It has been held over and over in this state that old age, feebleness, forgetfulness, filthy personal habits, personal eccentricities, failure to recognize old friends or relatives, physical disability, absent-mindedness and mental confusion do not furnish grounds for holding that a testator lacked testamentary capacity. In *Estate of Velladao,* 31 Cal.App.2d

355, 357 [88 P.2d 187], the decedent made a will when he was 85 years old, less than three months prior to his death and at a time when he was very weak, had been suffering for many years from heart trouble, diabetes, kidney and bladder trouble and other ailments from which he was then "gone away to almost nothing," could hardly speak and had a glassy stare in his eye, and was too sick to be shaved. Nevertheless, a judgment for a nonsuit was affirmed. In *Estate of Garvey,* 38 Cal.App.2d 449 [101 P.2d 551], the court said that repulsive or filthy personal habits, ill temper and a disagreeable disposition did not constitute insanity or unsoundness of mind; and there was evidence in that case that following an operation decedent drank to excess, was easily upset emotionally, was slovenly in his appearance and habits, and was not "as smart a man as he had been before." In *Estate of Collins,* 174 Cal. 663 [164 P. 1110], stinginess, repulsive or filthy personal habits, ill temper, jealousy, a dictatorial and disagreeable disposition were said not to constitute insanity or unsoundness of mind. In *Estate of Agnew,* 65 Cal.App.2d 553 [151 P.2d 126], a judgment in favor of contestant was reversed although the evidence showed that the testatrix was eccentric, slept on a cot without a mattress, used candles, wanted to go to bed with her clothes on, wore clothing that was soiled and so worn that when laundered it fell to pieces, was forgetful, was like a child in a way, and had a mind that seemed like it would drift off onto other subjects altogether. In *Estate of Wright,* 7 Cal.2d 348 [60 P.2d 434], also, a judgment in favor of contestant was reversed, although the evidence showed that the testator lived alone in his little shack with dirt and junk, that he was "not right," that he gave one of the witnesses a fish which he said he had caught but which she found had been soaked in kerosene, that on occasions he would run out of the house partially dressed, that he picked up articles from garbage cans and hid them around his house, picked up paper flowers and pinned them on his rose bushes, and went away with a blanket wrapped around him. In *Estate of Campbell,* 46 Cal.App. 612 [189 P. 812], a judgment granting a nonsuit was affirmed. The court said that one with a defective memory who failed to recognize old friends or recall happenings was not bereft of testamentary capacity, as one of the characteristics of old age is forgetfulness or lapses of memory; and that an aged person may be afflicted

with these shortcomings without being incapable of disposing by testament of his estate according to the course he wishes it to take.

In *Rollins* v. *Smith*, 72 Cal.App. 773 [238 P. 171], in reversing a judgment setting aside the assignments of certificates of stock executed by decedent, the court said that proof that a person old and infirm was at times unable to recognize his friends, unable to transact his regular business, had filthy habits and was irritable and ill-tempered, and that his mind was weak and failing, did not establish as a fact that his mental incompetency was such that he could not make a will or otherwise dispose of his property.

In *Estate of Packer*, 164 Cal. 525, 529 [129 P. 778], in affirming a judgment of nonsuit, the court said that the only circumstance having any bearing on the matter of mental soundness was a repetition of questions that had already been asked and answered; that this had a tendency to show that the testator's memory was somewhat weakened but did not show an impairment of his ability to grasp the salient facts in relation to his property, its situation, and the objects of his bounty; and would not suffice as proof of want of testamentary capacity. A like holding was made in *Estate of Dole*, 147 Cal. 188 [81 P. 534], where, though the evidence showed that deceased at the time he made his will was old and feeble and fast approaching the end, the court said this was not sufficient to justify the setting aside of his will if the testator knew his property, the manner in which it was invested, and his relatives who were the object of his bounty; and it added that old age alone, no matter how great, never did and cannot invalidate a will, if from all the evidence it appeared that the testator had sufficient capacity.

In *Estate of MacCrellish*, 167 Cal. 711 [141 P. 257, L.R.A. 1915A 443], the court reversed a judgment revoking probate of the will, though the evidence showed that testatrix would forget what had been told her; claimed there was a man in the room when there was no one there, that a man was watching her and had tried to get into her room at night, and that she had got messages slipped under her door; and expressed fears of being watched and of being robbed. In *Estate of Phillips*, 202 Cal. 490 [261 P. 709], the court affirmed a judgment admitting a will to probate though same had been executed by the testator when he was 93 years old and there was evidence that he was absent-minded, repeated

questions already asked and answered a short time previously, and at times seemed confused and unable to recognize those about him.

In *Estate of Finkler*, 3 Cal.2d 584 [46 P.2d 149], a judgment for proponents notwithstanding a verdict in favor of contestants was affirmed, though the evidence showed that decedent was building an airplane in the attic of his home, spoke of a tunnel which ran from the hill on his property to Lake Merced, failed to recognize and speak to acquaintances at various times, was cruel to dumb animals, was eccentric and had various delusions. The court cited *Estate of Bemmerly*, 110 Cal.App. 550 [294 P. 33], to the effect that a testator is of sound and disposing mind and memory, if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recall the nature and situation of his property, and remember and understand his relations to the persons who have claims upon his bounty and whose interests are affected by the will.

In *Estate of Stump*, 202 Cal. 308 [260 P. 543], in affirming a judgment based upon a directed verdict for proponent, the court said that the wills of aged and infirm people, or people sick in mind as well as in body, must be upheld as in other cases if, notwithstanding their enfeeblement, testamentary capacity is shown. Citing *Estate of Chevallier*, 159 Cal. 161, 168 [113 P. 130]. ■ It is well established that opinions of witnesses regarding the mental soundness or testamentary capacity of a testator are of no greater value that the reasons given in support of the opinions. *(Estate of Flint*, 179 Cal. 552 [177 P. 451]; *Estate of Collins, supra; Estate of Smethurst*, 15 Cal.App.2d 322, 335 [59 P.2d 830].)

In *Estate of Arnold*, 16 Cal.2d 573 [107 P.2d 25], the court said (p. 585) that mere proof of mental derangement or even insanity in a medical sense is not sufficient to invalidate a will; and (p. 588) that if a person is in the possession of sufficient mental capacity to understand the nature of his act in making the will, the extent and character of his property, and his relationship to persons who are the natural objects of his bounty, he is possessed of sufficient mental capacity to make a will disposing of his estate. Citing *Estate of Perkins*, 195 Cal. 699, 703 [235 P. 45]; *Estate of Shay*, 196 Cal. 355, 361 [237 P. 1079]; *Estate of Sexton*, 199 Cal. 759, 764 [251 P. 778].

Also see *Estate of Russell*, 80 Cal.App.2d 711, 719 [182 P.2d 318], hearing by Supreme Court denied.

██ In the case before us those conditions were fully met, as appears from the will itself and the testimony of Attorney Hoover, which is uncontradicted in the record. ██ Furthermore, the will cannot be said to be an unnatural one though it may give the son something more than it gives the daughter. The son had lived with his mother for many years, had no other home, was no longer young, had been permanently and totally disabled by his previous accident, and also suffered from heart disease. The daughter, on the contrary, had a husband and two grown sons who were apparently prosperous, and was, herself, able to and did work in the canneries during the summer months. The record also shows that the relationship between the contestant and Theodore Selb was not friendly, and it would have been only natural for decedent to assume that if the home were left to the son and daughter in equal shares, such divided ownership would result in further disharmony and probably eviction of the son from his home.

Respondent in effect concedes that the evidence adduced by her does not show general incompetency, and that none of it goes to the mental capacity of testatrix on the day the will was executed; but she urges that decedent was possessed of an insane delusion that her daughter and grandson had mistreated her; and, though an insane delusion was not alleged as a ground of contest, that there is sufficient proof thereof to sustain the allegation of the contest and the finding of the jury that testatrix was not of sound and disposing mind. She relies upon the testimony of Attorney Hoover that his recollection was that when Mrs. Selb gave him instructions regarding her will she stated that she had been ill recently and had been taken to stay with her daughter, and that the daughter and the daughter's son had continually hounded her about her property and tried to induce her to give it to them until she had got disgusted with it and just decided to cut down the gift to her daughter on that account.

Decedent had previously executed two wills, one in May, 1929, in which, after making certain small bequests of specific personal property she had devised her estate to her two children in equal shares, and nominated her son as executor; and the other in March, 1939, in which she omitted

the specific bequests in the former will, but left her estate to her son and daughter in equal shares, naming the daughter as executrix. It therefore appears that in the will of March, 1944, she did cut down the share of the daughter to some extent, though she did not by any means totally disinherit her.

That the possession of an "insane delusion" which leads a testator to dispose of his property otherwise than he would have done had he not possessed such insane delusion is sufficient to invalidate a will may be conceded. But to have such effect testator must have been actually possessed of a delusion, and it must have been an insane one. In *Estate of Kendrick*, 130 Cal. 360 [62 P. 605], the testatrix destroyed a will she had previously made in favor of a sister, and executed one leaving her estate to a niece. Prior to the time this later will was made decedent had suffered a paralytic stroke from the effects of which she died about 14 months after the execution of the will. Probate of such will was denied and it was contended that it was the result of an insane delusion, contestant relying on testimony that after her stroke decedent gave evidence of hostility to her sister which was violent and groundless; that she had delusions that her sister had stolen all her wearing apparel, was trying to put her out of the house which she occupied, and had tried to kill her. On reversing the judgment in favor of contestant the court said, pages 364-365:

"Prejudices, dislikes, and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion. Whenever one's mind is tricked or deceived into a false opinion or belief, it has been played upon; it is deluded. But an insane delusion is the spontaneous production of a diseased mind leading to the belief in the existence of something which either does not exist or does not exist in the manner believed—a belief which a rational mind would not entertain, yet which is so firmly fixed that neither argument nor evidence can convince to the contrary. Moreover such an insane delusion must have operated to cause the production of the will which is under attack. (*Estate of Carpenter*, 94 Cal. 406 [29 P. 1101]; *In re McDevitt*, 95 Cal. 33 [30 P. 101]; *Cole's Will*, 49 Wis. 181 [5 N. 346]; *Middleditch* v. *Williams*, 45 N.J.Eq. 734 [17 A. 826, 4 L.R.A. 738]; *Stackhouse* v. *Horton*, 15 N.J.Eq. 228; 1 Redfield on Wills, 89; *Estate of Scott*, 128 Cal. 57 [60 P. 527].)"

It then considered the evidence, and regarding the asserted delusion of decedent that her sister had stolen her clothing stated that there was testimony both that decedent did and that she did not entertain such a delusion; that it did not appear that decedent had ever been reasoned with upon the matter, or any effort made to convince her of the falsity of her belief; and that ''If she believed it upon the evidence of her senses, or upon the statements of some one in whom she had confidence, no matter how ill-founded her conviction might have been, it could not be placed in the category of insane delusions.'' As to the delusion that the sister was trying to put her out of her house, the court pointed out that decedent had executed a deed of her home to her sister with the express understanding that it should not be recorded until after the grantor's death, but that soon after Mrs. Kendrick suffered her stroke her sister recorded the deed; and when Mrs. Kendrick sent for the keys she found that her sister had taken them. And though the sister told decedent that she had no thought of ejecting her, and offered to return the keys, decedent was not mollified. The court said, page 366:

''The violated agreement, the recording of the deed, the detention of the keys, the locking of the chicken-house, the sale and removal of Mrs. Kendrick's lard, while not sufficient to justify the conclusion that Mrs. Masterson did intend to eject her invalid sister from the house, afforded some ground of belief to the sick and irascible woman that her sister designed to take advantage of her helplessness. And it being further considered that Mrs. Kendrick, when aroused, seems to have been both violent and extravagant of speech, the matter of the accusation does not appear extraordinary. At least the belief did not originate in a diseased mind, but found color for its support in the matters that have been recited. It cannot, then, be considered an insane delusion.''

Regarding the delusion that the sister was trying to kill decedent, some basis therefor was found in the fact that the sister had administered to the sick woman a dose of morphine in excess of that prescribed, and this was said to furnish some foundation for the accusation of decedent, and that such belief was not, therefore, ''the groundless and self-originating belief of a diseased mind.''

In *Estate of Allen*, 177 Cal. 668 [171 P. 686], where a daughter contested the will of her father who had entirely disinherited her and her sister in favor of two nephews, con-

testant relied upon alleged delusions on the part of testator that he had provided for his daughters by gifts, that his daughters were conspiring against him, that they were guilty of immoral acts, etc. The court said, page 671:

"The burden was on contestant to prove the existence of the alleged delusions, and to do this it not only devolved upon her to show that they had no foundation in fact, but also that there was no evidence, *however slight or inconclusive,* of any fact upon which the belief could be founded." (Italics added.)

The court there cited *Estate of Scott,* 128 Cal. 57, where it is said at page 62 [60 P. 527]:

"In ordinary language, a person is said to be under a delusion who entertains a false belief or opinion which he has been led to form by reason of some deception or fraud, but it is not every false or unfounded opinion which is in legal phraseology a delusion, nor is every delusion an insane delusion. If the belief or opinion has no basis in reason or probability, and is without any evidence in its support, but exists without any process of reasoning, or is the spontaneous offspring of a perverted imagination, and is adhered to against all evidence and argument, the delusion may be truly called insane; but if there is any evidence, however slight or inconclusive, which might have a tendency to create the belief, such belief is not a delusion. One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist. 'An insane delusion is not only one which is error, but one in favor of the truth of which there is no evidence, but the clearest evidence often to the contrary. It must be a delusion of such character that no evidence or argument will have the slightest effect to remove.' (*Merrill* v. *Rolston,* 5 Redf. 252.)"

In *Estate of Shay,* 196 Cal. 355 [237 P. 1079], a judgment in favor of contestants of a will, based upon a verdict of a jury, was reversed. The court said that the evidence of general testamentary incapacity was insufficient to overcome the presumption of sanity. And as for an "insane delusion" on the part of testator that one of his daughters was addicted to the use of liquor and drugs, and the contention of contestant that in dictating the terms of his will decedent had stated that for that reason he was making a trust provision for her instead of an outright legacy, the court said, page 361:

"The evidence shows that this daughter was neither a drunkard, a drug addict, nor a spendthrift, and it is argued

that the will is therefore the product of a delusion which affected the testamentary purpose of the testator. But the existence of a mere delusion, that is to say, a false or mistaken belief concerning the existence of a fact, does not affect testamentary capacity. A delusion to invalidate a will must be an insane delusion, that is to say, a belief which is the spontaneous product of a diseased mind, which comes into existence without reason or evidence to support it and which is adhered to against reason and against the evidence. (*Estate of Scott*, 128 Cal. 57 [60 P. 527]; *Estate of Kendrick*, 130 Cal. 360 [62 P. 605]; *Estate of Perkins*, 195 Cal. 699 [235 P. 45]; *Estate of Allen*, 177 Cal. 668 [171 P. 686]; *Estate of Hess*, 183 Cal. 589 [192 P. 35]; *Estate of Calef*, 139 Cal. 673 [73 P. 539].) There is nothing in the record to indicate that this belief of the testator, mistaken though it may have been, was without reason or evidence or that it was adhered to against reason or against evidence. The finding of testamentary incapacity is not sustained by the evidence.''

In *Estate of Putnam*, 1 Cal.2d 162 [34 P.2d 148], where both general insanity and the possession of insane delusions were alleged as grounds of contest and the contestants prevailed in the trial court, the case was reversed on appeal, the court holding that the evidence was insufficient to show general insanity, and that as there was some foundation in fact for the testator's beliefs which influenced his disposition of his estate they could not be said to constitute insane delusions or any delusions at all. It said also, pages 171-172:

''The only reasonable conclusion from the record before us is that the testator was possessed of a parental belief, not abnormal or unfounded under the facts, relating to his son's ability to handle money, and that he took steps to protect him with an income adequate to his needs in addition to his own earnings for the balance of his life. Even though there may have been discord in the family during the decedent's lifetime or even injustice in the division of income between the children, that alone would not be sufficient to set aside a will executed by one in full possession of his mental faculties and otherwise competent to make a will. An insane delusion has been defined to be the conception of a disordered mind which imagines facts to exist of which there is no evidence and the belief in which is adhered to against all evidence and argument to the contrary, and which cannot be accounted for on any reasonable hypothesis. 'One cannot be said to act under

an insane delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from facts which are shown to exist.' (*Estate of Scott,* 128 Cal. 57, 62 [60 P. 527] ; *Estate of Shay,* 196 Cal. 355 [237 P. 1079] ; *Estate of Perkins,* 195 Cal. 699 [235 P. 45] ; *Estate of Powell,* 113 Cal.App. 670 [299 P. 108].) The facts in this case do not meet the tests prescribed by our law and are inadequate as a foundation for setting aside the testamentary acts in question.''

The same rule prevails elsewhere. (See 28 Am.Jur., p. 657 ; 21 Words and Phrases (perm. ed.) pp. 573-583.)

■ Assuming, then, that Mrs. Selb at the time that she executed her will believed that her daughter and her daughter's son had ''hounded her about her property'' and had tried to induce her to give it to them, and that this belief induced her to change the terms of her will, the question arises whether the evidence shows that there was any evidence, however slight, to supply a basis for such a belief. The testimony of contestant's son, Pierce Morris, is to the effect that in January, 1944, after a discussion with his family, he took it upon himself to talk to his grandmother with the idea in mind that they would sell the ranch and put the money into funds so that it would take care of· her, but that he couldn't get anything from her; that her son was hostile to the idea, had it in his mind that the grandson was there to get some money out of the estate, and said so in no uncertain terms; that shortly after that Theodore Selb became ill and was not able to take care of his mother, whereupon Mrs. Selb was brought to her daughter's home; and that while she was there he again tried to talk to her—''to sell the same idea''—but she was still in the same frame of mind, and all she could say was that she just had to get back to the ranch—to live there.

Mrs. Morris, the contestant, testified that while her mother was with her in her home from January 8, to 25, 1944, her mother ''acted more like a maniac . . .''; that she wanted to go somewhere else and stay; that she wanted to go home; that she would run out of the house, scream, throw up her hands, and the witness would have to go out of the house, get her by the arm and tell her to come in. She also stated, in response to a question as to whether she ever attempted to talk to her mother about the latter's business affairs, that she couldn't ''because every time I tried to say a thing there

would be something brought up about being none of my business . . . so I got so I didn't try to mention business or anything." She also said that before her mother was brought to her home in January, 1944, she had said that "if mother comes in and stays with me there will have to be some provision made"; and she admitted that after her mother left on January 25th, she did not see her again until her mother broke her hip about a year later, at which time she was taken to the hospital where she died on September 12, 1945.

Other witnesses testified that while decedent was in her daughter's home in January, 1944, all she could talk about was that she wanted to go home. Mrs. Rife said that when Mrs. Selb was brought to her home in January, 1944, she was upset because the Morrises had wanted her to sign some paper.

While the witness Harris testified that Mrs. Selb had complained of treatment that she had received in her daughter's home, where they had tried to get her to sign some paper, and that the daughter and her son had used violence upon her to accomplish this purpose, it is not reasonable to believe that such violence was resorted to. Such an extravagant claim may have originated in the mind of the over-zealous witness rather than in that of the decedent. But discounting the matter of violence, the fact remains that some efforts had been made by contestant and the members of her family to induce Mrs. Selb to sell her home and go elsewhere to live; and for this reason it cannot be said that the so-called delusion of testatrix that her daughter and grandson had hounded her about her property and tried to get her to give it to them was "the groundless and self-originating belief of a diseased mind" (*Estate of Kendrick, supra*), or that it was without "any evidence, however slight or inconclusive, which might have a tendency to create the belief" (*Estate of Allen, supra; Estate of Scott, supra)*, or that the belief of the testatrix, "mistaken though it may have been, was without reason or evidence or that it was adhered to against reason or against evidence" *(Estate of Shay, supra)*, or that it was not "based upon evidence, however slight" *(Estate of Hill,* 1 Cof. 380, 402).

It was said in *Taylor* v. *McClintock,* 87 Ark. 243 [112 S.W. 405, 414], that a belief grounded on evidence, however slight, necessarily involves the exercise of the mental faculties of perception and reason; and in such cases, no matter

how imperfect the reasoning process may be, or however erroneous the conclusion reached, it is not an "insane delusion." Citing *Estate of Scott, supra.*

■ Appellants finally complain that an instruction given to the jury, and which was the only one bearing upon the subject of insane delusions, was erroneous, and the giving of same so prejudicial as to justify a reversal of the judgment. It reads:

"If you find that the testatrix at the time of making her alleged will in March, 1944, *acted and conducted herself as if she had a persistent belief* that her daughter, Bertha Morris, had not treated her fairly or justly or affectionately, but had treated her wrongly and injuriously, and further find that there was no evidence or probability for such belief, and further find that such belief was without any foundation or reason, then in such case, such belief may be considered as an insane delusion. And, if you find in accordance with the foregoing, that the testatrix was suffering from such insane delusion at the time of the making of her alleged will of March 18, 1944, then I instruct you that you must find that such will is invalid." (Italics added.)

Without going farther said instruction may be said to be erroneous because of the language underlined above and because it omits the essential qualification that the "persistent belief" had influenced the making of the will. See *Estate of Kendrick, supra,* 130 Cal., at pages 370-371.

■ Respondent replies that even though the instruction was defective it should be disregarded because of the provisions of article VI, section 4½, of the Constitution. We cannot agree with this contention in this particular case, for two reasons, one that the record shows that the jury before reaching a verdict returned into court and asked for further instruction on what constituted unsoundness of mind, whereupon the court reread to them its instructions previously given, including the one above set forth; and for the second reason that reliance upon the possession of an insane delusion is substantially the only ground upon which the verdict could find possible support.

The judgment is reversed with directions to admit the will to probate.

Peek, J., and Thompson, J., concurred.